**Walter D. BALLA, et al., Plaintiffs,**

v.

**BOARD OF CORRECTIONS, et al., Defendants.**

Civ. Nos. 81–1165, 78–1045.

United States District Court, D. Idaho.

March 25, 1987.

Walter D. Balla, William M. Prince, Timothy Haak, Gary G. Allen, Weyland R. Cowan, Darby J. Sharp, pro se.

Dean Schwartzmiller, Appointed Lay-Assistant, ISIC Law Library, Boise, Idaho, for plaintiffs.

Jim Jones, Atty. Gen., State of Idaho, Robert R. Gates, Timothy R. McNeese, Deputy Attys. Gen., Corrections Section, Boise, Idaho, for defendants.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

RYAN, District Judge.

### INTRODUCTION

After thirteen days of trial, beginning on March 5, 1984, this court entered its Memorandum Opinion, Findings of Fact, Conclusions of Law and Order on November 1, 1984, in which the court dealt with a variety of eighth and fourteenth amendment claims regarding conditions and policies at the Idaho State Correctional Institution (ISCI). *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558 (D.Idaho 1984). Upon entering Findings of Fact and Conclusions of Law, the court required certain changes to be made at ISCI. The court's order encompassed areas identified in *Rhodes v. Chapman*, 452 U.S. 337, 364, 101 S.Ct. 2392, 2408, 69 L.Ed.2d 59 (1981), including food preparation; medical facilities; places for eating; safety; clothing; nutrition; medical, dental and mental health care; certain rehabilitative programming; and staffing.

On July 11, 1985, after the court conducted compliance hearings to determine whether defendants had complied with the opinion and order entered November 1, 1984, the court adopted defendants' plans for compliance with certain amendments and ordered that the procedures outlined in those plans be formally adopted and implemented in all respects not later than October 1, 1985.

On October 10, 1985, plaintiffs filed a Motion for Contempt alleging that the defendants had not complied with and were in violation of this court's order of July 11, 1985, regarding the issue of psychiatric care. The plaintiffs did not challenge, through a contempt motion, the implementation of any programs or policies ordered adopted in the July 11, 1985, order except the psychiatric care program. On July 29, 1986, this court held a hearing regarding the plaintiffs' Motion for Contempt. In the court's order of August 18, 1986, the court determined that the defendants had complied with the requirements specified in the plans previously adopted by the court. The court rejected plaintiffs' arguments in support of their position that the policies and programs adopted by the court, even if in place, did not raise psychiatric care at ISCI to constitutional minima and that the court should completely reopen and re-try the adequacy of the psychiatric care program. The court's order of August 18, 1986, closed to relitigation all issues raised in this action except the issue of overcrowding.

In *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558 (D.Idaho 1984), the court did not explicitly find, in terms of numbers of inmates, unconstitutional overcrowding at ISCI. In fact, this court, based upon the testimony heard in March of 1984, felt the obvious overcrowding at ISCI would in all likelihood be alleviated by giving the Board of Corrections a little time to develop some of their announced plans. Of particular concern to this court was the historical failure in the operation of ISCI to meet constitutional minima in the housing of high-security and close custody inmates. Thus, the court in its original decision sidestepped the issue of overcrowding for another day.

However, from an inmate and prison personnel safety standpoint, the overcrowding and double-celling of inmates in medium

custody had reached a critical state to the end that the court did order a doubling of the employment of security personnel, particularly in the medium security tiers.

At the compliance hearings held in the summer of 1985, the court became concerned and was persuaded that a full determination needed to be made regarding the overall overcrowded condition at ISCI. Instead, the court found that increased numbers of medium custody inmates resulting in double-celling of inmates would require the prison administration to employ twice the security personnel on those medium security tiers. The court viewed this requirement from a personal safety standpoint. At the behest of the plaintiffs, the court has agreed to make a determination regarding overcrowding at ISCI as a specific condition of confinement.

On October 31, and November 1, 1985, the court heard testimony on plaintiffs' claim that ISCI is overcrowded to such an extent as to violate the eighth amendment of the United States Constitution. At the close of testimony, both parties agreed that the court would benefit from expert testimony. Further hearing on the matter was continued until such time as a court-appointed expert would be prepared to testify as to his findings and conclusions.

Thomas Lonergan was appointed the court's expert. Mr. Lonergan toured the prison facility and retired to prepare his report. Scheduled hearings were vacated and reset due to Mr. Lonergan having been overcome by illness. On September 3, 1986, the court was forced to relieve Mr. Lonergan of his duties as court-appointed expert.

The court directed the parties to meet in an attempt to agree on an expert to replace Mr. Lonergan. Failing to do so, the court ordered that the parties submit names and vitae of persons whom they recommended as the next court-appointed expert. On December 3, 1986, the court appointed W. Raymond Nelson as the court's expert.

Mr. Nelson toured the ISCI facility in January of 1987 and submitted his report during the first week of February 1987. On February 12, 1987, the court and its staff independently toured the ISCI facility. On February 13, 1987, the court conducted a hearing to provide the parties and the court an opportunity to question Mr. Nelson regarding his findings and conclusions contained in his report. The court then took the entire matter under advisement and, being fully advised in the premises, hereby sets forth the following Findings of Fact and Conclusions of Law on the issue of whether or not the admitted overcrowding at ISCI is of such proportions that the housing of inmates at ISCI does not meet the constitutional minima as required by the eighth amendment.

### LEGAL STANDARDS AND ANALYTICAL FRAMEWORK

 The eighth amendment prohibits cruel and unusual punishment involving the unnecessary and wanton infliction of pain. *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). There is no static test by which the court can determine whether conditions of confinement are cruel and unusual since the eighth amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. *Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. at 2398; *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

The concurring opinion in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), sets forth the specific conditions and situations which the court must look to when analyzing overall prison conditions and overcrowding:

In determining when prison conditions pass beyond legitimate punishment and become cruel and unusual, the "touchstone is the effect upon the imprisoned." *Laaman v. Helgemoe*, 437 F Supp [269], at 323. The court must examine the effect upon inmates of the condition of the physical plant (lighting, heat, plumbing, ventilation, living space, noise levels, recreation space); sanitation (control of

vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping, and working); safety (protection from violent, deranged, or diseased inmates, fire protection, emergency evacuation); inmate needs and services (clothing, nutrition, bedding, medical, dental, and mental health care, visitation time, exercise and recreation, educational and rehabilitative programming); and staffing (trained and adequate guards and other staff, avoidance of placing inmates in positions of authority over other inmates). See ibid.; *Ramos v Lamm*, 639 F2d [559], at 567–581. When "the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration," the court must conclude that the conditions violate the Constitution. *Laaman v. Helgemoe, supra*, at 323.

*Id.* at 364, 101 S.Ct. at 2408.

The Ninth Circuit, in *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir.1982), identified the proper analysis for eighth amendment claims:

In analyzing claims of Eighth Amendment violations, the courts must look at discrete areas of basic human needs. As we have recently held, " '[A]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety.' " *Wright v. Rushen*, 642 F.2d 1129, 1132–33 (9th Cir.1981) (*Wright*), *quoting Wolfish v. Levi, supra*, 573 F.2d [118] at 125.

. . . .

As we have said, however, "[E]ach condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions." *Id.* at 1133. This is no more than a recognition that a particular violation may be the result of several contributing factors. "But the court's principal focus must be on specific conditions of confinement. It may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct Eighth Amendment violations." *Id.* To find an Eighth Amendment violation, courts must identify specific conditions that fail to meet Eighth Amendment requirements. We cannot rely on a vague conclusion that the "totality of conditions" violates the Eighth Amendment.

*Id.* at 1246–47.

An excellent case dealing with overcrowding is *Fischer v. Winter*, 564 F.Supp. 281 (N.D.Calif.1983). Judge Peckham saw overcrowding as the cause and specific substandard conditions and situations as the effect of overcrowding. However, the court was careful not to find overcrowding as an eighth amendment violation based on the totality of conditions at the prison. The court identified specific conditions that failed to meet eighth amendment requirements, but recognized that particular violations may be the result of other contributing factors. The Ninth Circuit, in *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir.1982), mandates this analysis and prohibits a totality of conditions analysis. *Id.* at 1247.

In *Fischer v. Winter*, 564 F.Supp. 281, the court considered the problem of overcrowding specifically in the context of minimum square footage available to each inmate. The court noted:

Expert testimony establishes as a general proposition that overcrowding increases stress, that excessive levels of stress may induce or aggravate physical illness and mental or emotional disturbance, and that overcrowding correlates with both suicidal and assaultive behavior. A common-sense definition of overcrowding would be "too many people in too little space." Correctional professionals have attempted to quantify overcrowding by establishing standards for the minimum square footage that should be available to each inmate in his or her housing area for the maintenance of physical and mental health.

The minimum square footage standards are affected by several variables, the most important of which are opportunities for movement outside the immediate housing area, for activities, and for exercise. Other stress-related variables also influence the square footage standard; these include lighting—both type and amount, noise levels, privacy or the lack thereof, and visitation opportunities. Over the past couple of decades, minimum square footage standards recommended by various professional organizations have increased, from 50 square feet per inmate to 70 or 80, depending on the amount of mobility allowed to the inmates. By professional definition, then, a jail is overcrowded when it does not provide its inmates with the minimum square footage required by the applicable minimum standard.

*Id.* at 291 (footnote omitted).

■ The courts, however, must refrain from constitutionalizing the American Correctional Association (ACA) standards and it is error to rely exclusively on per capita square footage recommendations. *Hoptowit v. Ray,* 682 F.2d at 1249. The *Hoptowit* court further defines the role of experts in determining eighth amendment violations:

In determining whether a challenged condition violates "evolving standards of decency," courts may consider opinions of experts and pertinent organizations. But these opinions will not ordinarily establish constitutional minima. What experts may consider desirable may well constitute appropriate goals to which the other branches may aspire but they do not usually establish those minimums below which the Constitution establishes a prohibition. *See Rhodes v. Chapman, supra* [452 U.S. 337], 101 S.Ct. [2392] at 2400 n. 13 [69 L.Ed.2d 59]. Indeed, they weigh less heavily in this determination than what the general public would consider decent. *Id.*

*Id.* at 1246.

## FINDINGS OF FACT

1. At the first hearing on overcrowding held on October 31, and November 1, 1985, testimony from inmates and correction officials alike established that increased staffing did not provide the increase in personal safety and property protection for the inmates which is necessary and required. While Glen Johnson and Director Alfred Murphy testified that violence had decreased even though population had increased at ISCI, numerous inmates testified to knowledge of violent acts and personal attacks. Correctional Officer Michael Boegeman testified that the inability to lock inmates down, especially those housed in day rooms, creates a real safety problem. Correctional Officer Boegeman testified that he could not guarantee the safety of the inmates in Unit 10. The court finds that increased staffing proportionate to inmate population increases does not fully alleviate problems associated with overcrowding, nor significantly enhance personal safety of inmates and employees.

2. Unit 1 presently houses inmates being treated for psychological disorders. The design or rated capacity of Unit 1 is twelve inmates. The nature of the inmate classification and the physical structure of Unit 1 permits only one inmate per cell. On January 7, 1987, thirteen inmates were housed in Unit 1. Plaintiffs' Ex. 1 and 9.

3. Unit 2 currently houses geriatric and infirm inmates. This classification of offenders often have unique needs and require special care. Unit 2 consists of twenty-four cells of approximately 72 square feet. A day room of approximately 523 square feet is available to inmates housed in Unit 2. Each cell is equipped with a sink and toilet, and shower heads are located at the end of each group of twelve cells. On January 7, 1987, forty-four inmates were housed in Unit 2. These inmates spend most of their time in the day room. Plaintiffs Ex. 1 and 9.

4. Unit 3 currently houses inmates that require protective custody. Protective custody is the classification level designed to segregate those inmates subject to sexual assault, or extortion, or who are unable to pay debts to inmates in the prison population at large, and who have provided that

information to prison officials. *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1570 (D.Idaho 1984). Protective custody inmates are allowed approximately one and one-half hours per week in the gymnasium. Protective custody inmates are in their units well over twenty hours per day and have their movements severely restricted. These inmates spend considerable time in their unit primarily due to their classification status. *Id.* at 1570–71. Unit 3 consists of twenty-four cells. The twelve cells on the left side of the Unit 3 building are approximately 65 square feet. The twelve cells on the right side of Unit 3 are approximately 70 square feet. The day room available in Unit 3 is approximately 216 square feet. Each cell of one tier is equipped with a sink, toilet, and shower heads at the end of the tier. The other tier of cells consists of what is known as "dry cells," i.e., no sinks or toilets in the cells. On January 7, 1987, Unit 3 housed forty-eight inmates.

5. Unit 7 is currently used as a receiving unit. Unit 7 consists of forty cells of approximately 59 square feet. The forty cells are divided into four separate ranges of ten cells each. The corridor and cage space in front of the cells is used for exercise purposes. There are no day rooms. Each cell contains a stainless steel toilet and sink and shower heads are provided at the end of each row of ten cells. On January 7, 1987, seventy-seven inmates were housed in Unit 7, of which seventy-three were housed in the thirty cells used for male inmates. One-half of the thirty cells used for male inmates had three persons assigned to them. Seven inmates had been housed in the unit between four and five weeks, eighteen had been housed in the unit between three and four weeks, sixteen had been housed in the unit between two and three weeks, and thirty-six less than two weeks. Plaintiffs' Ex. 9. Director Murphy testified that the average length of time an inmate spends in reception is five to six weeks. Defendants' Memorandum on Overcrowding, filed October 15, 1985, at 14, states:

The new reception unit is Unit 7. There are times when Unit 7 has more than its capacity of 40 prisoners. However, these prisoners are rarely in Unit 7 for longer than two weeks. Such practice is acceptable within the parameters set out by the U.S. Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 [60 L.Ed.2d 447] (1979).

One tier in Unit 7 was used for receiving and classification of women prisoners. Thus, it is clear that close to half of these thirty, 52–square-foot cells are from time to time occupied by three human beings, one required of necessity to sleep on the very limited floor space. It takes no imagination to realize such confined conditions would be and are highly stressful, degrading and intolerable and three times beyond design.

6. Unit 8 consists of seventy-eight cells, each containing approximately 66 square feet. The seventy-eight cells are divided into three separate wings. One wing houses those inmates under death sentence, a second wing is reserved for those in punitive segregation and the third is utilized for administrative segregation. Administrative segregation is composed of those individuals who are the most difficult to deal with from an institutional standpoint. One wing of Unit 8 is currently under reconstruction, which is nearly completed. Each cell is furnished with a stainless steel sink and toilet and shower heads are available in each wing. Exercise rooms are available in Unit 8. Inmates housed in Unit 8 are rarely outside of their cells for more than one hour per day. Inmates housed in Unit 8 are not permitted to be in the same cell or exercise area with another inmate. *See generally Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1571 (D.Idaho 1984) (Finding of Fact No. 30); plaintiffs' Ex. 1 and 9. There are approximately fifteen cages on the yard which may be used for outside exercise.

7. Close custody inmates are currently housed in Unit 9. Close custody is the custody level between medium custody and maximum security. Those inmates in close custody represent a higher security risk of either escape or antisocial behavior than do those in medium custody and a lesser de-

gree of those two possibilities than maximum security. Those inmates in close custody are relegated to that custody level because their sentence is such that they will not be released in the near future or because they have received a disciplinary report(s) and are unable to conform their behavior to acceptable standards. *Balla v. Idaho State Board of Corrections,* 595 F.Supp. 1558, 1570 (D.Idaho 1984) (Finding of Fact No. 27). Close custody inmates are in their units more than twenty-two hours per day. Unit 9 consists of seventy-eight cells, each containing approximately 66 square feet. The seventy-eight cells are divided into three separate wings. Each cell is equipped with a toilet and sink, with shower heads at the end of each wing. Day rooms are located at the end of each wing and are approximately 500 square feet. On January 7, 1987, Unit 9, while having a design capacity of seventy-eight inmates, housed one hundred one inmates. *See generally Balla v. Idaho State Board of Corrections,* 595 F.Supp. 1558, 1570 (D.Idaho 1984) (Findings of Fact 27 and 28); plaintiffs' Ex. 1 and 9.

8. As previously noted by this court, medium custody is the least restrictive custody designation at the main site. Medium custody inmates are housed in A–Block, Housing Unit 10, and Housing Unit 11. Medium custody inmates are those inmates deemed less likely to escape, better able to deal with personal interaction in prison, and more capable of holding down a prison industries job than either those inmates in close custody or maximum security. Presently, Housing Units 10 and 11 are double-bunked and double-housed. The cells are approximately 60 square feet each. While most of the units have two persons in each cell, those inmates in medium custody enjoy a greater degree of flexibility than do those inmates in either close or maximum custody. Inmates in medium custody are confined to their cells from 9:00 p.m. until 8:00 a.m. (although the doors are not locked and inmates continue to have access to rest room facilities); but at times other than this, inmates have freedom to roam the tier, which includes the hallway and day room. Moreover, many of those inmates in medium custody have a job of some sort which occupies all or a certain portion of their day. Those inmates in medium custody also have access to the yard areas which include the gymnasium and ball fields for approximately five and one-half hours each day from 1:00 p.m. until 3:30 p.m. and again from 6:00 p.m. until 9:00 p.m. Since most of the inmates in medium custody have jobs during the day, they are unable to utilize either the gymnasium or ball fields from 1:00 p.m. until 3:30 p.m. *Balla v. Idaho State Board of Corrections,* 595 F.Supp. 1558, 1569–70 (D.Idaho 1984) (Finding of Fact 25). Units 10 and 11 are identical in design and consist of seventy-two cells with each, as noted, containing just over 60 square feet. The seventy-two cells are divided into three wings of twenty-four cells. Each wing contains a central bathroom consisting of four urinals, three toilets, four sinks, and three showers. Day rooms are provided at the end of each wing, which are approximately 500 square feet each. On January 7, 1987, all cells were double-bunked and double-housed except one. One hundred forty-three and one hundred forty-four inmates were housed in Units 10 and 11, respectively.

Undisputed testimony was that from time to time numbers of inmates for periods of time were housed in the day rooms and/or required to sleep on mattresses on the floor. Providing for the housing of inmates in such an overcrowded fashion threatens the physical, mental and emotional health and certainly threatens their personal and property safety. Such conditions are dehumanizing, intolerable and certainly of no penological benefit.

9. A–Block is also a medium custody housing unit. A–Block consists of ninety-six cells, each containing approximately 68 square feet. A–Block is divided into four, twenty-four cell sub-units with each sub-unit having a 1,045 square foot day room. For each twelve-cell area there is a central bathroom with one urinal, two toilets, one shower and two sinks. Inmates housed in A–Block are assigned to full-time work details in prison industries.

In A–Block, as in Units 10 and 11, the court heard testimony and has received letters from inmates advising that from time to time and for periods of time medium custody inmates are required to sleep on mattresses on the floor in the cells in A–Block. Again, this causes unnecessary discomfort, pain and stress wherein such cells are housing inmates three times beyond their design capacity. Even though these are inmates who may have full-time prison industry jobs, such overcrowded confining incarceration threatens their physical, mental and emotional health, foreseeably causing such stress setting off normal human reactions, causing disciplinary problems wherein a well-meaning medium custody inmate can find himself placed in the confines of maximum security.

10. Medium custody inmates are free to roam the tier, including the hallway and day room. Medium custody inmates are out of their unit at prison industries jobs, visiting, gymnasium, law library, blood plasma, ball fields, education courses, religious education and services, and meals for the majority of the day. The opportunity for such activities is present whether or not a particular inmate takes advantage of them. Plaintiffs' Ex. 1 and 9.

11. Plaintiffs have alleged that due in part to the sheer number of inmates on the main yard, personal hygiene products have not been supplied in a timely manner. Director Murphy testified that the problem has been in supplies being back-ordered rather than in distributing those supplies once delivered to the prison site. The court's expert, Raymond Nelson, recommends that the court impose a condition upon the institution that personal hygiene materials be supplied in a timely manner. Plaintiffs' Ex. 9.

12. Mr. Nelson, in his report, recommends that all malfunctioning plumbing fixtures be repaired within forty-eight hours. Plaintiffs' Ex. 9. At the hearing in this matter, Mr. Nelson indicated that forty-eight hours was a target time frame and that forty-eight hours could be exceeded upon a showing of cause. Mr. Nelson indicated that inmate damage should be taken into consideration on a showing of cause. He further indicated that this condition may be suspended in the event of an emergency such as riot. Director Murphy testified that forty-eight hours was unreasonable in certain circumstances when plumbing fixtures and parts had to be ordered. Director Murphy preferred three working days from the date of the written or oral report of the plumbing problem to an ISCI employee.

13. Mr. Nelson recommends that the court impose the condition that headphones be used on radios to reduce noise in the housing units. The plaintiffs concurred in this condition, but only during the time period from 10:30 p.m. to 8:00 a.m. Increased noise levels result in increased stress. The court makes no finding as to whether the typical noise levels in any unit in the main site at ISCI are excessive.

14. To the extent that any Conclusions of Law are deemed to be Findings of Fact, they are incorporated into these Findings of Fact.

## CONCLUSIONS OF LAW

1. To the extent that any Findings of Fact are deemed to be Conclusions of Law, they are incorporated into these Conclusions of Law.

2. In this action, the court has previously found various conditions of confinement, policies and practices at the main site of ISCI to violate constitutional standards and ordered those violations remedied. In dealing with the problem of overcrowding, the court made no express finding or conclusion regarding overcrowding per se. The court ordered an increase in staffing proportionate to increase in double-bunking, or 200 percent over design capacity, focusing upon personal safety rather than the potential infliction of pain due to space restrictions and population levels. After reopening the issue of overcrowding and conducting hearings on the matter, the court has determined that the admitted overcrowded condition at ISCI has reached the level of unconstitutional overcrowding which is the unnecessary and wanton infliction of pain. *See Rhodes v. Chapman,* 452

U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The court hereby incorporates its November 1, 1984, Memorandum Opinion, Findings of Fact, Conclusions of Law and Order; *Balla v. Idaho State Board of Corrections,* 595 F.Supp. 1558 (D.Idaho 1984).

3. As hereinafter discussed with specificity as to each unit, bunking practices, coupled with the length of time each day inmates are restricted to their cells and/or unit common areas, provide the basis for the court's analysis in a challenge to overcrowded conditions. The specific size of cells and common areas is highly relevant in analyzing crowded conditions. Also, access to toilet, sink and shower facilities is an important inquiry. *See Toussaint v. Yockey,* 722 F.2d 1490, 1492 (9th Cir.1984). In *Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir.1982), the court stated:

> [T]he district court constitutionalized the ACA standards. The district judge failed to analyze how much time the prisoners must spend in their cells each day. If prisoners need not remain in their cells for a substantial part of the day, analysis of square footage in cells may be largely irrelevant.

*Id.* at 1249.

4. Inmates housed in Unit 1 for treatment of psychological disorders may not, consistent with eighth amendment guarantees, be double-celled. Single-celling is required for treatment needs and personal safety. The court concludes that Unit 1 be single-celled with a maximum capacity, consistent with design capacity, of twelve inmates, as long as this unit continues to serve its present function of treating psychiatric inpatients.

5. Unit 2 houses geriatric and infirm inmates with unique needs. The court notes that many geriatric inmates have been moved from ISCI and are currently housed in the Idaho correctional facility in Orofino. While the cells in Unit 2 contain more square footage than all other units except Unit 3, the day room, in which these inmates spend the majority of the day, is only 523 square feet. With forty-four inmates assigned to this unit as of January 7, 1987, less than 12 square feet of day room is available per inmate. Complete double-celling would reduce that figure to below ten square feet. These inmates are rarely, if ever, outside of their unit. Given the total area available to these inmates in the unit and the time spent in the unit, the court has concluded that housing more than 150 percent of design capacity, or thirty-six inmates, is constitutionally impermissible. The court concludes that no more than thirty-six inmates be housed in Unit 2 at any time.

6. Protective custody inmates, currently housed in Unit 3, are severely restricted in movement and access to programs often simply because they are young and subject to predatory inmates. Double-celing these inmates would seem inconsistent with the goal of separating them for their own protection. Some protective custody inmates can be safely double-celled after an administrative determination of compatability. The cells in this unit are the same size as in Unit 2 and larger than any other units; however, the day room has been cut down to half of that available in Unit 2. These inmates are outside of their unit only very infrequently during the week. It is certainly contrary to constitutional standards to double-cell protective custody inmates that can only be protected if single-celled and separated from other inmates, especially during those times of the day when attacks are most likely. There is certainly no penological justification for double-cell-ing protective custody inmates of this nature. Therefore, recognizing that certain protective custody inmates may safely be double-celled, the court concludes that no more than 150 percent of the design capacity, or thirty-six inmates, be housed in Unit 3.

7. Unit 4 is currently not designed or utilized for housing of inmates and the court makes no finding nor conclusion as to the availability or suitability of Unit 4 for housing inmates.

8. The cells in Unit 7 (designed as the former maximum security unit) are the smallest available at the main site of ISCI, and no day rooms are available to inmates housed in Unit 7. Inmates housed in Unit

7 for receiving and processing face severe space restrictions. While Director Murphy testified that the average length of time an inmate spends in Unit 7 is five to six weeks, defendants' trial brief notes that these inmates are rarely in receiving longer than two weeks. This inconsistency is substantial. The court's expert found several inmates on January 7, 1987, to have been in Unit 7 for over four weeks. The court has concluded that double-celling of inmates in Unit 7 is constitutionally acceptable, but due to movement and space restrictions, no inmate may be double-celled in Unit 7 for more than three weeks. While the court will not herein impose a maximum length of time within which an inmate may be housed in Unit 7, the court believes that three weeks is more than adequate time to process inmates. After questioning Director Murphy, the court is convinced that administrative alteration of policies regarding ordering presentence investigation reports and FBI reports and only accepting inmates unaccompanied by these reports would streamline processing of inmates once accepted into Unit 7.

As to Unit 7, the court further concludes that there is absolutely no penological justification or reasonable administrative justification for the defendants to at any time cause inmates to be triple-celled in Unit 7. The court would know of no evolving standards of decency that mark the progress of a maturing society which would condone the dehumanizing effect upon inmates being triple-celled in these small cells in Unit 7 for any period of time. The cumulative impact of such conditions of incarceration threatens the physical, mental and emotional health and well-being of any inmate even temporarily subjected to such treatment and/or creates probability of stressful human reaction surely leading to foreseeable disciplinary problems, recidivism and continued future incarceration. Such overcrowded housing of inmates falls well below constitutional minima and certainly causes wanton pain and suffering of such an unusual nature, it is prohibited by the eighth amendment.

9. Maximum custody inmates housed in Unit 8 are the most violent and administratively difficult inmates. All agree that penological concerns and constitutional protections mandate that these inmates be single-celled. Double-celling of maximum custody inmates currently housed in Unit 8 is intolerable under any circumstances. The design capacity of Unit 8 is seventy-eight and, therefore, the court concludes that no more than seventy-eight inmates be housed in Unit 8 at any time.

10. As a security risk, close custody inmates fall between medium custody inmates and maximum security inmates. Close custody inmates are currently housed in Unit 9 with thirty-three out of seventy-eight cells double-bunked as of January 7, 1987. Close custody inmates are often volatile, violent and predatory. While it has been the stated goal of the administration at ISCI to single-cell these inmates since early in 1984, that goal has not been reached. The propensity and potential for violence and sexual attacks among these inmates and the length of time during the day in which these inmates are confined to their unit dictates single-celling. The good intentions of the administration to single-cell these inmates and the administration's recognition that there is no penological justification for double-celling these inmates are praiseworthy, but do not change the fact that evolving standards of decency that mark the progress of our maturing society demand, at a minimum, protection of inmates from each other. In a situation such as found in Unit 9, defusing a potentially explosive situation is best accomplished with an ounce of prevention. Taking into consideration the nature of these inmates and their classification and the time the entire close custody inmate population is restricted to the unit, the court has concluded that constitutional minima can only be reached by single-celling the entire unit. The court concludes that, consistent with the design capacity, no more than seventy-eight inmates be housed in Unit 9.

11. Medium custody inmates currently housed in Units 10 and 11 are completely double-celled in relatively small cells containing approximately 66 square feet. A day room of approximately 500 square feet

is allocated for use by forty-eight inmates. Medium custody inmates have more freedom to be outside of their cells and their unit, than any other custody level at the main site of ISCI. Double-celling of medium custody inmates is not the protection and security concern which is associated with close, protective or maximum custody inmates. However, if the medium custody units are totally double-celled, overall space allocation is compromised. Each inmate's total space allocation is substantially constricted, causing increase in tension, noise, and potential for violent reaction. Units 10 and 11 were designed for seventy-two inmates. Double-celling at 150 percent of design capacity will allow for a maximum of one hundred eight inmates in each unit. This would reduce by thirty-six the number of inmates in each unit, providing for more space per inmate and commensurately less noise and anxiety. The court concludes that Units 10 and 11 be used to house no more than one hundred eight inmates in each unit at any time.

12. A–Block is also a medium custody unit with slightly larger cell space and substantially larger day room space. Bathroom facilities are less adequate than in other units. Inmates housed in A–Block work full-time in prison industries and the demand upon space within the unit is greatly reduced. The court has concluded that upon the condition that these inmates remain in a full-time work status, 150 percent double-celling over design capacity is constitutionally permissible. The design capacity in A–Block is ninety-six inmates and the court concludes that this housing unit can constitutionally accommodate no more than one hundred forty-four inmates. To exceed one hundred forty-four inmates in A–Block would place a more severe strain on the toilet facilities which are already inadequate and cause the total living space available to each inmate to be intolerable.

A–Block is a housing unit provided for the commendable purpose of achieving rehabilitative effects and a place to house inmates working in prison industries. Even though rehabilitation is not constitutionally required, such inmates have attained the status and character of responsibility necessary to have meaningful prison industry jobs. The causing of A–Block to be intolerably overcrowded with inadequate plumbing causes a cumulative impact that this court concludes would threaten the physical, mental and emotional health and well-being of such class of inmates and creates a high probability of recidivism and future incarceration.

13. Based upon the evidence, the court's personal inspection and familiarity with the facility, expert opinion, case law, human nature and human decency, this court further concludes: It is constitutionally prohibited, under the circumstances herein described at the main yard at ISCI, for any cell to house more than two inmates *at any time.* It is constitutionally prohibited, under the circumstances, for inmates to be housed at any time in day rooms or other non-designed cell areas or to be forced to sleep on mattresses on the floor. *See Fischer v. Winter,* 564 F.Supp. 281 (N.D. Calif.1983); *Battle v. Anderson,* 447 F.Supp. 516, 525 (E.D.Okla.), *aff'd,* 564 F.2d 388 (10th Cir.1977). The court does conclude that these constitutional prohibitions be adhered to at all times.

14. The court is aware that personal hygiene products have not been readily available in certain instances. The court heard no substantial evidence that personal hygiene supplies were being withheld for any improper purpose. The court concludes that, under the evidence as presented, while individual inmates may have been inconvenienced by delays in providing supplies, no pain has been demonstrated such that an eighth amendment violation has occurred. The court believes the testimony that this untimely supply of personal hygiene products from time to time is due to back-order and not because they are being withheld for any other purpose. The court trusts that the administration will take all steps necessary to alleviate the problem, but will refrain from fashioning a specific order.

15. The toilet facilities available in the various housing units at ISCI makes prompt repair crucial in the event of plumb-

ing problems. Mr. Nelson recommends that the court compel the defendants to correct any plumbing disorders within a forty-eight hour period. Director Murphy insists that three working days time is logistically more feasible. The court heard very little specific evidence of instances of infliction of pain due to extended periods of time in which plumbing fixtures were in disrepair. However, since toilet facilities are limited in the various housing units at ISCI, the court is constrained to mandate that the defendants attend to all plumbing disorders within twenty-four hours of their oral or written report to ISCI staff and remedy those plumbing problems within three working days from such report.

16. Specific evidence of noise levels in the various housing units at the main site of ISCI has not been produced to the court. Mr. Nelson recommends that the court order that headphones be used on personal radios to cut down on noise. At the hearing in this matter, plaintiffs suggested that this condition be imposed only during the hours of 10:30 p.m. to 8:00 a.m. The court lacks sufficient evidence to make a finding regarding problems with noise other than those associated with the general din which accompanies groups of people. As a specific problem, the court can draw no legal conclusion. The court would applaud plaintiffs' self-regulation to this extent and would not undermine defendants' regulatory policies currently in existence or which may be imposed as to use of headphones with personal radios. The court will not dictate those policies and cannot mandate headphone use during specific times. The court has no way to adequately police such a condition. Furthermore, the court is confident that the caps herein ordered on the number of inmates allowable in each housing unit will alleviate much of the stated problem associated with noise.

17. The court concludes that a permanent injunction shall issue prohibiting defendants from causing the population caps to be exceeded per housing unit discussed above. Only through adequate structural change or redesign of the housing units may the population caps ordered herein be increased. Defendants will be further enjoined from engaging in any reclassification inconsistent with this court's November 1, 1984, opinion, or in any other vehicle, scheme or mechanism designed to undermine the spirit and letter of this opinion and order.

18. It is the further conclusion of this court that the permanent injunction will be suspended until June 30, 1987, in order that defendants have sufficient time to take whatever steps they deem necessary and appropriate under the circumstances to come into compliance with the terms of this order.

19. Upon entry of this order, all issues raised in this action will be decided. The court will, therefore, cause this action to be closed.

20. While the clerk will cause this action to be closed, plaintiffs will retain the right and opportunity to petition this court to reopen this matter in the event the terms of the permanent injunction are violated. Violation of the terms of this injunction may be deemed a contempt of court. This court will not hesitate to invoke its broad power to impose punishment for contempt of court and to take any other action necessary to deter similar conduct in the future.

## ORDER

Based upon the foregoing, and the court being fully advised in the premises,

IT IS HEREBY ORDERED that defendants be, and are hereby, PERMANENTLY ENJOINED from:

1. Double-celling inmates in Unit 1 or causing more than twelve (12) inmates to be housed in Unit 1 at any time.

2. Housing more than thirty-six (36) inmates in Unit 2 at any time.

3. Housing more than thirty-six (36) inmates in Unit 3 at any time.

4. Double-celling inmates in Unit 7 for more than three (3) weeks, or triple-celling inmates, or housing more than eighty (80) inmates in Unit 7 at any time.

5. Double-celling maximum custody inmates or housing more than seventy-eight (78) inmates in Unit 8 at any time.

6. Double-celling close custody inmates or housing more than seventy-eight (78) inmates in Unit 9 at any time.

7. Housing more than one hundred eight (108) inmates in Units 10 and/or 11 at any time.

8. Housing more than one hundred forty-four (144) inmates in A–Block at any time.

In order to allow the defendants a reasonable opportunity to comply, this injunction will be suspended until June 30, 1987, and effective July 1, 1987, shall automatically take full force and effect as the order of this court.

IT IS FURTHER ORDERED that no more than two (2) inmates be housed in any cell for any period of time at any time and that no inmates be housed at any time in day rooms or other non-designed cell areas or forced to sleep on mattresses on the floor. This order shall take effect immediately.

IT IS FURTHER ORDERED that defendants attend to all plumbing disorders in the housing units within twenty-four (24) hours of oral or written report to the Idaho State Correctional Institution (ISCI) staff and that those plumbing disorders be remedied within three (3) working days from such report.

IT IS FURTHER ORDERED that the clerk of the court terminate the above-entitled action in his records, without prejudice to the right of the parties to reopen the proceedings for good cause shown, for the entry of any stipulation or order, or for any other purpose required to obtain a final determination of the litigation.