Dennis CROZIER, Plaintiff,

v.

Duane SHILLINGER and Mike Sullivan, Defendants.

Donald DAVIS, Plaintiff,

v.

Duane SHILLINGER and Mike Sullivan, Defendants.

Bruce BRYAN, Plaintiff,

v.

Duane SHILLINGER and Mike Sullivan, Defendants.

Charles E. MATHISEN, Plaintiff,

v.

Duane SHILLINGER and Mike Sullivan, Defendants.

Nos. C88–361 to C88–363, C88–371.

United States District Court, D. Wyoming.

March 10, 1989.

Dennis Crozier, pro se.

Donald Davis, pro se.

Bruce Bryan, pro se.

Charles Mathisen, pro se.

Terry L. Armitage, Asst. Atty. Gen., State of Wyo., Cheyenne, Wyo., on the briefs on behalf, of defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1] (WITH FINDINGS)

KERR, District Judge.

The above-entitled matter having come before the Court on defendants' motion for summary judgment; and the Court having fully and carefully reviewed and considered the motion and record in this matter, and being fully advised in the premises, FINDS:

Plaintiffs, inmates at the Wyoming State Penitentiary, each have filed a civil rights action pursuant to 42 U.S.C. § 1983, claiming that their Eighth and Fourteenth Amendment rights have been compromised due to their status as protective custody prisoners. Specifically, they raise as supportive of their claim the differences between the opportunities and benefits afforded them as compared to those available to the rest of the general prison population and maintain that their access to fewer activities constitutes cruel and unusual punishment.

Being in protective custody, plaintiffs claim to have experienced less access to canteen services, general visits, recreational and exercise equipment, work opportunities, educational programs, and rehabilitative therapy—the last two being of particular importance to them from the standpoint of future eligibility for parole. Plaintiffs note that inmates in the general population are able to avail themselves of the canteen, selecting the food items they want from the shelves three times per week whereas inmates under protective custody can only do so once a week and then only via written request slips, all too often choosing from a list which they feel may not be complete. As regards visitation rights, plaintiffs complain additionally that on those occasions when an inmate from the general population has a visit at the same time that an inmate from protective custody does, the latter will be placed either in an isolation booth or another room for the visit, neither of the rooms being equipped with vending machines and an outside visiting area like the general visitation area utilized by the rest of the prison population. Complaints surrounding the other areas outlined above essentially mirror those already addressed.

One additional point plaintiffs raise regards the procedure that protective custody inmates follow in order to be seen by the prison doctor. Allegedly they are asked to submit request slips whenever they have medical problems. The difficulty with this system, say the plaintiffs, is in the manner in which these slips are handled. By the time the slips reach the infirmary, the doctor has already made his daily rounds, necessitating a 24–hour delay in their ability to obtain medical care.

At the outset, any discussion regarding plaintiffs' concerns must begin with the premise that the role of federal courts in matters of institutional security and disci-

1. Pursuant to Fed.R.Civ.P. 12(b), defendants' motion to dismiss is hereby converted into a motion for summary judgment due to submis- sion and consideration of materials outside the pleadings.

pline is a limited one, such matters being uniquely left to the expertise of prison administrative officials. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 563 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Battle v. Anderson,* 564 F.2d 388, 392 (10th Cir.1977); and *Bethea v. Crouse,* 417 F.2d 504, 505–506 (10th Cir.1969). Courts are not institutionally equipped to fashion prison administrative procedures. Such statements, however, are not meant to imply that courts are totally powerless in matters such as this; for, where there has been clear abuse in the institutional setting, courts have not hesitated to step in and protect the constitutional rights of inmates. *See, e.g., Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), *reh'g denied,* 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); *Williams v. Lane,* 851 F.2d 867 (7th Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989); *Vosburg v. Solem,* 845 F.2d 763 (8th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988); *Davenport v. DeRobertis,* 844 F.2d 1310 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556 (1st Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988); *Walsh v. Mellas,* 837 F.2d 789 (7th Cir.1988), *cert. denied,* — U.S. —, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988); *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326 (3rd Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700 (11th Cir.1985); *Lareau v. Manson,* 651 F.2d 96 (2nd Cir. 1981); *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754 (3rd Cir.1979); *Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196 (1st Cir.1974), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Balla v. Board of Corrections,* 656 F.Supp. 1108 (D.Idaho 1987); and *Cody v. Hillard,* 599 F.Supp. 1025 (D.S.D.1984), *aff'd,* 799 F.2d 447 (8th Cir.1986), *reh'g granted,* 804

F.2d 440 (8th Cir.1986), *and on reh'g,* 830 F.2d 912 (8th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988).

Long after his departure, this Court has not forgotten the resounding words of Chief Judge Murrah:

> [B]eing fully cognizant that one does not lose all his constitutional rights when he enters a prison, ... we have never turned a deaf ear to a bona fide claim for relief based upon the deprivation of a constitutional right when asserted by a federal or state prisoner....

*Bethea,* 417 F.2d at 506 (citations omitted).

■ Constitutional rights, while not suspended at the prison's front door, are, of necessity, pared back in a recognition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)).

In the penitentiary setting, protective custody entails segregating certain inmates flagged as under a real threat from fellow prisoners. In order to guarantee the safety of these segregated prisoners, certain of the activities they might normally be able to participate in if they were commingled with the general population must be curtailed by authorities. Such a process should be tailored in as unoffensive a manner as permitted by the realities of the situation. Where security concerns are involved, a court is not required to apply the "least restrictive means" test in deciding whether a more appropriate balance between prisoners' wants and institutional demands need be struck. *See Hay v. Waldron,* 834 F.2d 481, 485 (5th Cir.1987). The fact that this segregative unit is found in the proximity of units housing prisoners on death row and those under maximum security does not necessarily raise the spectre of a constitutional violation.

Since 1981, significant measures have been taken at the penitentiary in response

to increased requests for protective custody. Not only is there a cell block in the maximum security area for protective custody inmates but also a twenty-four cell unit specifically for protective custody purposes was added on, including a shower area inmates can utilize multiple times per day, a day room, an indoor and outdoor exercise area, and an employee observation area. Shillinger Affidavit at ¶¶ 4, 9. Most of the twenty four inmates currently in protective custody are there at their own request, leaving no choice to officials who otherwise might be liable were the requests refused or ignored. *Cf. Hopkins v. Britton,* 742 F.2d 1308 (11th Cir.1984) (failure of prison officials to take all reasonable steps to protect an inmate injured during a prison uprising may constitute a constitutional violation). While protective custody may be sought for a variety of reasons, the bottom line is the prisoner's legitimate expectation that reasonable steps will be taken to ensure his or her safety. With this expectation must come the realization that a price must of necessity be exacted; otherwise, the concept itself would be rendered meaningless.

Each protective custody cell is 10 feet by 8½ feet long; 7 feet 4 inches wide; and 8 feet in height, exceeding the recommendations of the American Corrections Association, and contains a toilet and sink combination, a bed with a mattress, and a table with an attached stool. *Id.* at ¶ 11. A window 40 inches long by 27 inches wide can be partly opened by each cell inmate. *Id.* For approximately sixteen hours per day, inmates in protective custody are able to remain outside their cells and participate in numerous activities. *Id.*

Among the activities afforded to protective custody inmates are religious programs and counseling opportunities consisting of reality therapy, sex offender therapy, drug and alcohol therapy, support groups, and individual counseling. *Id.* at ¶ 12. Out of nine prison counselors, three are assigned to the area housing protective custody inmates and provide case management services, individual and group counseling, and sponsorship of group sessions for all prisoners. *Id.* at ¶ 6h. In all re-

spects, these opportunities mirror those available to the general prison population. *Id.* Several changes in recreational opportunities for segregated inmates have come about as a result of the institutional grievance filed by these prisoners. In addition to having an area for weight lifting and games, an outside recreation area for protective custody inmates is now available. *Id.* at ¶ 12g. The maximum security gymnasium is now available as well for these inmates after 8:30 p.m., along with special outdoor exercise periods which, according to the warden, are not taken advantage of by most of the protective custody inmates. *Id.* With approximately seventy square feet per cell per inmate and around sixteen hours worth of mobility in and out of each cell, plaintiffs' mental and physical health is not being adversely affected.

As regards food, protective custody inmates are able to spend up to $70 per week at the inmate store known as the canteen. Plaintiffs' Response to Affidavit at ¶ 12f. Canteen orders are taken once a week and substitution is permitted where an inmate specifies so in writing. Shillinger Affidavit at ¶ 12f. There is no intimation in the record that the meals plaintiffs receive are not wholesome. *Cf. Ramos,* 639 F.2d at 571 (inmates must be provided nutritionally adequate food "prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates....").

Visitation privileges for the segregated inmates are from 8:00 a.m. to 5:00 p.m. on Mondays and Wednesdays with special visits arranged on weekends and holidays. *Id.* at ¶ 12c. Prisoners in the general population have visits on Tuesdays, Thursdays, and Saturdays or Sundays. *Id.* Absent a disciplinary problem, all visits are scheduled in a contact visitation area; where a private visit with family members can be arranged, certain protective custody inmates are allowed to use the family visiting center. *Id.* In this vein, another change brought about by the filing of a grievance has been to allow the scheduling of social activities between protective custody inmates and their family and friends

approximately every three months. *Id.* at ¶ 121. These social activities consist of a meal, music, a program, and general socializing. *Id.* This activity is similar to the social events made available to the general prison population. The fact that some visits for protective custody inmates are cancelled due to a conflicting visit to a prisoner in the general population is not constitutionally actionable; for, a prisoner has no absolute constitutional right to visitation. *See Evans v. Johnson*, 808 F.2d 1427 (11th Cir.1987).

As is the case with prisoners in the general population, protective custody inmates are permitted to pursue individual educational interests beyond the opportunities afforded. *Id.* at ¶ 12j. Again, because of their status, some differences are apparent. While individualized tutoring is available in areas such as adult basic education, general equivalency diploma study, and college correspondence courses, segregated inmates, unlike other prisoners, are not allowed to attend the classes. Instead, an instructor meets with protective custody inmates separately. *Id.* Otherwise, protective custody inmates are entitled to use the same library as the general population after 8:30 p.m. *Id.* at ¶ 12k. In addition to having access to two law libraries, legal materials and other library materials are also brought to the protective custody unit several times each week. *Id.*

One area which has admittedly posed a challenge to prison officials is work activities. Due to the number of prisoners at the penitentiary, the warden informs the Court that possibilities for work activities for all prisoners are rapidly being exhausted. *Id.* at ¶ 12n. Currently, protective custody inmates perform janitorial work, grounds cleanup, cell painting, and typing. *Id.* Research is under way to formulate new work opportunities. *Id.* Some protective custody inmates are currently being considered for possible transfer to a new forestry work camp opening in mid–1989. *Id.* at ¶ 12o.

While plaintiffs take issue with certain of the warden's characterizations of the benefits and opportunities available to protective custody inmates, nothing in their responses evidences a constitutional deprivation beyond that which the nature of incarceration demands. The fact remains that the suspension of certain of the benefits and opportunities afforded to the general prison population represents an accommodation with the institutional interest in providing adequate protection to plaintiffs and others similarly situated. As the Supreme Court has recognized, "[t]o the extent that ... conditions [of confinement] are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Being in protective custody, an inmate does not suffer cruel and unusual punishment "simply because he may be deprived of certain privileges available to the general prison population." *Shrader v. White*, 761 F.2d 975, 981 (4th Cir.1985). The conditions existing in the protective custody unit far from typify cruel and unusual punishment. To the contrary, conditions at the Wyoming State Penitentiary meet or exceed guidelines established by the American Corrections Association respecting minimal standards for prisoners in protective custody.[2] *See* Shillinger Affidavit at ¶ 13. Any inequalities between protective custody inmates and prisoners in the general population are brought about by security concerns and, hence, do not give rise to an equal protection argument. In sum, the Court holds that the conditions of confinement for prisoners in protective custody at the Wyoming State Penitentiary are not "so totally without penological justification that ... [they result] in the gratuitous infliction of suffering...." *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929,

---

**2.** Plaintiffs' complaints regarding the adequacy of medical care in their unit are without merit as qualified medical personnel visit the unit daily as required by the guidelines. *See* Shillinger Affidavit at ¶ 13. There is no evidence showing a "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied*, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977).

49 L.Ed.2d 859 (1976). Plaintiffs present no cognizable claim under the Eighth or Fourteenth Amendments. If it is greater access plaintiffs want, then they may rejoin the general prison population at any time perceived threats have abated. According to the warden, despite the fears that some of the prisoners in protective custody may have, the majority of them would not be in jeopardy if they chose to leave protective custody. Shillinger Affidavit at ¶ 8.

Plaintiffs themselves admit that inmates in Wyoming receive privileges in excess of those required under the law. *See* Grievance Forms at p. 7. However, they point out that each time they have voiced complaints regarding the restricted opportunities provided in protective custody, the response has always been the same, namely that lack of adequate funds and manpower prohibits making additional activities available.

Such responses are simply echoes of the larger problem of prison overcrowding. Currently, this nation's prison systems are being taxed to their limits and beyond. However, courts do not control the purse and cannot ordinarily be turned to for answers. As has been observed:

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, *all of which are peculiarly within the province of the legislative and executive branches of government.*

*Procunier v. Martinez,* 416 U.S. 396, 404–405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (emphasis added).

For the above-stated reasons, the matter is ripe for summary disposition.

NOW, THEREFORE, IT IS ORDERED that defendants' motion for summary judgment be, and the same is, hereby granted.