**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PRISON LEGAL NEWS,
        *Plaintiff-Appellee,*

v.

ARNOLD SCHWARZENEGGER,
Governor of the State of
California; JAMES E. TILTON,
Secretary; KINGSTON PRUNTY;
STEVE KESSLER; SCOTT KERNAN; LE
ANN CHRONES; MARISELA MONTES,
        *Defendants-Appellants.*

No. 09-15006

D.C. No.
4:07-cv-02058-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
December 10, 2009—San Francisco, California

Filed June 9, 2010

Before: Diarmuid F. O'Scannlain, Robert E. Cowen,* and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge O'Scannlain

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

## COUNSEL

Emily L. Brinkman, Deputy Attorney General, San Francisco, California, argued the cause for the defendants-appellants and filed the briefs. Edmund G. Brown Jr., Attorney General, Jonathan L. Wolff, Senior Assistant Attorney General, and Michael W. Jorgenson, Supervising Deputy Attorney General, were also on the briefs.

Ernest Galvan, of Rosen, Bien & Galvan, LLP, San Francisco, California, argued the cause for the plaintiff-appellee. Sanford Jay Rosen, of Rosen, Bien & Galvan, LLP, filed a brief. Kenneth M. Walczak and Blake Thompson, of Rosen, Bien & Galvan, LLP, were also on the brief.

George C. Harris, of Morrison & Foerster LLP, San Francisco, California, filed a brief on behalf of Columbia Legal Services, Florida Justice Institute, Inc., Legal Aid Society, Massachusetts Correctional Legal Services, Inc., National Center for Youth Law, National Police Accountability Project, Prisoners' Legal Services of New York, Southern Poverty Law Center, Uptown People's Law Center, and Volunteer Lawyers' Project for the Southern District of Florida as amici curiae in support of the plaintiff-appellee and in support of affirmance. Sarah E. Griswold, of Morrison & Foerster LLP, was also on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether, and to what extent, the publisher of a monthly prison news magazine may recover attorneys' fees from the State of California and various of its officers for monitoring their compliance with a settlement agreement resolving claims about prison conditions.

I

A

Prison Legal News ("PLN") is a nonprofit charitable organization based in Seattle, Washington. PLN publishes *Prison Legal News*, a monthly magazine containing news and analysis relating to the legal rights of prisoners. It also distributes prisoner-oriented books.

In September 2005, PLN contacted the California Department of Corrections and Rehabilitation ("CDCR") with concerns about the delivery of its materials to prisoners in the CDCR's custody. PLN complained that some CDCR institutions refused to deliver *Prison Legal News* to prisoners housed in particular units, while other CDCR institutions disallowed delivery of the magazine altogether on the ground that PLN was not an "approved vendor." PLN also complained about bans on its hardcover books. In PLN's view, these and other CDCR policies violated PLN's First Amendment right to free speech and Fourteenth Amendment right to due process of law.

On December 11, 2006, after a year of negotiation, PLN and the CDCR entered into "an agreement to settle specific claims . . . alleging that the CDCR, or CDCR employees, censored PLN publications." The agreement was signed on behalf of the CDCR by James E. Tilton, Secretary of the

CDCR, and Michael W. Jorgenson, Deputy Attorney General of the State of California. The parties agreed, among other things, that "[t]he practice by CDCR adult institutions of requiring publishers such as PLN to obtain approved vendor status shall cease"; that "[t]he practice by CDCR adult institutions of banning hardcover publications shall cease"; that "when CDCR adult institutions disallow books, magazines, newspapers, or periodicals, the adult institutions shall notify the inmate that it is disallowed and will notify the publisher in compliance with due process requirements"; and that "CDCR will develop a centralized list of disapproved magazines or publications that are prohibited as offensive, threatening, contain security concerns, or obscene."

The CDCR also agreed to pay PLN $65,100 for "alleged violations of constitutional and statutory rights under federal and state law," and to pay PLN's counsel "reasonable attorneys' fees, costs and expenses until the time that this Settlement Agreement is signed by the parties." In addition, paragraph 7(b) of the agreement provided:

> PLN and its attorneys expressly reserve their rights to pursue claims for attorneys' fees, costs and expenses for work performed after the time the Settlement Agreement is signed by all parties, including for work spent on substantive issues related to this Agreement and/or work spent securing their fees for fees and collecting any and all fees, costs and expenses that are due to them. The CDCR expressly reserves its right to oppose any such claim.

Finally, the parties agreed that PLN would file a complaint in federal district court within 150 days of the signing of the agreement, alleging the claims that the agreement "resolved." The parties stipulated that the agreement "shall accompany the complaint," and that following dismissal of PLN's claims, "the Court will retain jurisdiction to enforce the Settlement

Agreement . . . and to determine, if necessary, reasonable attorneys' fees, costs and expenses."

B

As contemplated by the settlement agreement, PLN filed a complaint in April 2007 against Governor Arnold Schwarzenegger and various officers of the CDCR (collectively, "the state officials") in their individual and official capacities, seeking monetary, injunctive, and declaratory relief under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments. Soon thereafter, the parties informed the district court that they had "negotiated resolution of claims asserted in the complaint," requested that the complaint be dismissed without prejudice, and stipulated that PLN was entitled to $320,000 in attorneys' fees and costs for work done through December 11, 2006—the date of the settlement.

The district court granted the parties' request for dismissal without prejudice, and entered an order "retain[ing] jurisdiction to enforce the Settlement Agreement between the Parties including, without limitation, disputes over Defendants' compliance with the terms of the Agreement and disputes over the amounts of attorneys' fees, costs and expenses to be paid to Plaintiff's attorneys." The court also confirmed the award of $320,000 in attorneys' fees and costs to PLN for the period leading up to the settlement.

In October 2007, PLN moved for attorneys' fees and costs incurred from December 12, 2006, through August 31, 2007. Concluding that PLN was "entitled to attorneys' fees for work performed after the settlement agreement was signed," *Prison Legal News v. Schwarzenegger*, 561 F. Supp. 2d 1095, 1100 (N.D. Cal. 2008), the district court ordered the state officials to pay PLN an additional $137,672.79 in fees and costs for the period in question, *id.* at 1107. Although the state officials had opposed PLN's motion, they did not appeal the court's

order, which effectively brought the total fees and costs to nearly $458,000 as of that point.

In October 2008, PLN filed a second motion for attorneys' fees and costs, requesting a further $143,322.96 for the period between September 1, 2007, and October 15, 2008. Attorneys' fees constituted $141,402.00 of the requested amount. PLN arrived at that figure by multiplying the number of claimed attorney-work hours by the 2008 hourly rates of the attorneys who performed the work. In the relevant period, PLN's attorneys claimed 162.7 hours of "merits" work—*i.e.*, work ensuring compliance with the settlement agreement— and 223.7 hours of "fees" work—*i.e.*, work securing fees, including fees requested in PLN's first motion. The 2008 hourly rates of the attorneys who performed the work were $740 for a law firm partner who graduated from law school in 1962; $370 for a law firm associate who graduated in 2001; $340 for a law firm associate who graduated in 2003; and $170 for a law firm paralegal.

The state officials opposed PLN's second motion for attorneys' fees and costs, arguing that the hours claimed and the rates billed were unreasonable. The state officials further argued that they had met all of their obligations under the settlement agreement. They thus urged the district court to terminate its jurisdiction over the agreement and to refuse to entertain any additional fee requests by PLN.

In December 2008, the district court granted in part PLN's second motion. The court determined that the rates billed by PLN's attorneys were reasonable, and that the hours claimed were reasonable as well, with the exception of 23.75 hours of "merits" work "related to censorship issues outside the scope of the settlement agreement." After reducing the fee request accordingly, the court awarded PLN $137,502.46 in attorneys' fees and costs—$48,562.17 in fees and costs for "merits" work, and $88,940.29 in fees and costs for "fees" work— bringing the cumulative total to about $595,000. The court

then "decline[d] [the state officials'] request to conclude that CDCR has completed all of its obligations under the settlement agreement and that no more fees applications may be submitted by [PLN]." The court stated that the state officials "shall continue to follow the terms of the settlement and [PLN]'s counsel may incur reasonable fees ensuring that they do."

The state officials appeal the district court's ruling on PLN's second motion for attorneys' fees and costs. Until now, they have largely acquiesced in PLN's efforts to obtain reimbursement. It was, after all, *they* who entered into a generously worded settlement agreement with PLN; *they* who acceded to the district court's retention of jurisdiction, including over fee disputes; *they* who stipulated to an award of $320,000 in fees and costs for work leading up to the settlement; and *they* who declined to appeal the additional award of nearly $138,000 upon PLN's initial fee request. All told, including the amount at issue here, the state officials have incurred over half a million dollars in fees and costs for PLN's attorneys. The narrow question before us now is whether they can be heard to complain about the latest bill for $137,502.46.

II

The state officials first contend that PLN is not eligible to recover attorneys' fees for the type of "merits" work claimed in PLN's motion—namely, work monitoring the state officials' compliance with the agreement.

**[1]** Title 42 U.S.C. § 1988 provides that in an action, such as this one, brought under § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." In *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), the Supreme Court construed the term "prevailing party" to refer to a party that obtains a

judicially sanctioned "material alteration of the legal relationship of the parties." *Id.* at 604 (internal quotation marks omitted).[1] In light of *Buckhannon*, we have held that a plaintiff who obtains a legally enforceable settlement agreement qualifies as a "prevailing party," at least when the district court retains jurisdiction to enforce the agreement. *Richard S. v. Dep't of Dev. Servs.*, 317 F.3d 1080, 1088 (9th Cir. 2003). Given that the district court has retained jurisdiction to enforce the parties' settlement agreement here, we have no trouble concluding that PLN is a "prevailing party" within the meaning of § 1988. The question remains, however, whether such status renders PLN statutorily eligible to recover attorneys' fees for monitoring the state officials' post-settlement compliance.

**[2]** In *Keith v. Volpe*, 833 F.2d 850 (9th Cir. 1987), we held that a party that prevails by obtaining a consent decree may recover attorneys' fees under § 1988 for monitoring compliance with the decree, even when such monitoring does not result in any judicially sanctioned relief. *Id.* at 855-57. Although this case involves a settlement agreement, not a consent decree, the difference is immaterial. In both contexts, monitoring serves the same purpose: causing defendants to fulfill their obligations "more speedily and reliably." *Id.* at 857 (internal quotation marks omitted). Thus, to the extent *Keith* remains good law, we must conclude that § 1988 authorizes PLN to recover attorneys' fees for monitoring the state officials' compliance with the parties' settlement agreement.

According to the Seventh Circuit in *Alliance To End Repression v. City of Chicago*, 356 F.3d 767 (7th Cir. 2004), however, *Keith* does not survive the Supreme Court's decision in *Buckhannon*. *Id.* at 772. In clarifying the meaning of

---

[1]Although *Buckhannon* involved federal fee-shifting statutes other than § 1988, its interpretation of the term "prevailing party" applies here. *Buckhannon*, 532 U.S. at 602-03 & n.4; *Bennett v. Yoshina*, 259 F.3d 1097, 1100-01 (9th Cir. 2001).

the term "prevailing party," the Court in *Buckhannon* rejected the so-called catalyst theory of fee-shifting—the theory that a party prevails insofar as its efforts bring about some desired change, even if the change is not judicially sanctioned. 532 U.S. at 606. The Seventh Circuit reads *Buckhannon*'s rejection of the catalyst theory to mean that where, as here, monitoring has the effect only of bringing about the defendant's compliance, it is not compensable under § 1988. *Alliance*, 356 F.3d at 771. In the Seventh Circuit's view, only monitoring that produces a court-issued judgment or order is compensable after *Buckhannon*. *Id.* The suggestion is that *Buckhannon* compels us to overrule *Keith*, which reached a contrary holding. We disagree.

**[3]** A three-judge panel may reject prior circuit precedent in light of an intervening Supreme Court decision only when the Court's intervening decision has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). In concluding that monitoring is compensable under § 1988 even when it does not lead to a judgment or order, *Keith* relied on *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986), a Supreme Court decision that predates *Buckhannon*. *See Keith*, 833 F.2d at 855-56. In *Delaware Valley*, the Court considered whether a plaintiff could recover attorneys' fees under section 304(d) of the Clean Air Act for post-judgment monitoring of a consent decree. 478 U.S. at 557-58. The Court noted that the availability of such fees under § 1988 was widely recognized, citing circuit cases permitting their recovery even when the monitoring in question did not result in a judgment or order. *Id.* at 559. The Court explained that "[g]iven the common purpose of both § 304(d) and § 1988 to promote citizen enforcement of important federal policies," there was "no reason not to interpret both provisions governing attorney's fees in the same manner." *Id.* at 560. It then affirmed the award of fees for monitoring, with-

out considering whether the plaintiff's monitoring led to any judicially sanctioned relief. *Id.* at 561.

In *Buckhannon*, the Court did not mention, much less over-rule, *Delaware Valley*. Given that *Delaware Valley* survives *Buckhannon*, and that *Keith* applies the reasoning of *Delaware Valley*, we cannot say that the reasoning of *Keith* is so "clearly irreconcilable" with *Buckhannon* that we must reject *Keith* "as having been effectively overruled." *Miller*, 335 F.3d at 893; *accord Johnson v. City of Tulsa*, 489 F.3d 1089, 1108 (10th Cir. 2007) ("In light of *Delaware Valley* and this circuit's precedents, we cannot accept the proposition that [in the aftermath of *Buckhannon*,] attorney fees for post-decree efforts are compensable only if they result in a judicially sanctioned change in the parties' legal relationship."). We remain bound by *Keith*, notwithstanding the Supreme Court's intervening decision in *Buckhannon*. *See S.F. NAACP v. S.F. Unified Sch. Dist.*, 284 F.3d 1163, 1166 (9th Cir. 2002) (reaffirming in dicta the holding of *Keith* post-*Buckhannon*). We therefore hold that PLN may recover attorneys' fees under § 1988 for monitoring the state officials' compliance with the parties' settlement agreement.

**[4]** The state officials maintain that there is "no language" in the settlement agreement that allows PLN's counsel to monitor their activities and then submit bills for that work.[2] Paragraph 7(b) of the agreement, however, provides that "PLN and its attorneys expressly reserve their rights to pursue claims for attorneys' fees, costs and expenses for work performed after the time the Settlement Agreement is signed by all parties, including for work spent on substantive issues

---

[2]PLN notes that the district court rejected the state officials' argument that PLN "has no right to 'monitor compliance' under the Agreement" in ruling on PLN's first motion for attorneys' fees. PLN contends that because the state officials failed to appeal that ruling, they are estopped from raising the argument here. PLN, however, failed to raise the issue of estoppel in the district court. Accordingly, we consider the issue waived. *See Gieg v. DDR, Inc.*, 407 F.3d 1038, 1046 n.10 (9th Cir. 2005).

related to this Agreement." The work of PLN's attorneys monitoring the state officials' compliance was not only "performed after the time the Settlement Agreement [was] signed," but also "spent on substantive issues related to [the] Agreement." There can thus be no question that PLN's pursuit of fees for that work under § 1988 is consistent with the terms of the agreement.

### III

We next address whether the district court awarded a "reasonable attorney's fee" under § 1988. 42 U.S.C. § 1988(b). We review the district court's award for abuse of discretion. *Corder v. Gates*, 947 F.2d 374, 377 (9th Cir. 1991).

### A

The state officials first challenge the number of hours included in the district court's fee award. They assert that the district court should not have approved attorneys' fees for 31.5 hours of "merits" work that they characterize as "correspondence with inmates" unrelated to the settlement.[3]

[5] "The district court has a great deal of discretion in determining the reasonableness of the fee and, as a general rule, we defer to its determination, including its decision regarding the reasonableness of the hours claimed by the prevailing party." *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1993). "This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essen-

---

[3]PLN asserts that the state officials are estopped from raising this argument because a similar one was rejected in the district court's ruling on PLN's first motion for attorneys' fees, which the state officials did not appeal. By failing to raise the issue of estoppel in the district court, however, PLN has waived the issue on appeal. *See Gieg*, 407 F.3d at 1046 n.10.

tially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

The 31.5 hours at issue here involved reviewing and responding to letters from inmates in CDCR institutions complaining about access to published materials. Representative billing entries include time spent screening inmate mail for "urgent case issues"; reviewing inmate letters regarding the "banning of hardback books" and "problems receiving recent issues of *PLN*"; and writing to inmates about "settlement compliance." Noting that "prisoners themselves are often in the best position to observe whether the settlement agreement is being enforced," the district court determined that the 31.5 hours in question were reasonably expended on monitoring the state officials' compliance with the agreement and therefore were compensable.

**[6]** The district court's determination was not an abuse of discretion. It was reasonable for the district court to conclude that the 31.5 hours spent corresponding with inmates was part of PLN's efforts to monitor the state officials' compliance with the agreement. Without such correspondence, it would be difficult for PLN to discover or to document violations of the terms of the settlement. Given that PLN may recover attorneys' fees for monitoring the state officials' compliance, we hold that the district court did not abuse its discretion by awarding fees for the 31.5 hours of "correspondence with inmates" disputed here.

B

The state officials also challenge the hourly rates approved by the district court in awarding fees. They argue that the district court abused its discretion in several ways by relying on the 2008 hourly rates of PLN's San Francisco-based attorneys.

**[7]** First, the state officials argue that the district court should not have awarded fees at 2008 rates for 187.3 hours of

work performed by PLN's attorneys in 2007. The district court approved 2008 rates for work performed in 2007 in order to compensate for the delay in the payment of fees for that work. The state officials contend that the court instead should have awarded interest. We have said, however, that a "district court's determination to adjust to current rates rather than to make an interest adjustment squarely [is] within the bounds of its discretion." *Deukmejian*, 987 F.2d at 1407; *see also Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 947 (9th Cir. 2007). Accordingly, the district court did not abuse its discretion by applying 2008 rates to work performed in 2007.

**[8]** Second, the state officials contend that the district court should have applied the so-called *Laffey* matrix to arrive at the appropriate hourly rates. Approved originally in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), the *Laffey* matrix is an inflation-adjusted grid of hourly rates for lawyers of varying levels of experience in Washington, D.C. *Id.* at 371-75; *see Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 13 (D.D.C. 2000). The state officials argue that the district court should have increased the rates in the matrix by nine percent to account for the higher cost of living in San Francisco, and then based its fee award on the resulting rates. But just because the *Laffey* matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away. It is questionable whether the matrix is a reliable measure of rates even in Alexandria, Virginia, just across the river from the nation's capital. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009); *see also Grissom v. Mills Corp.*, 549 F.3d 313, 323 (4th Cir. 2008) (noting that the plaintiff provided "no evidence" that the *Laffey* matrix was "a reliable indicator of the hourly rates of litigation attorneys in Reston, Virginia, a suburb of Washington, D.C."). We thus cannot fault the district court for declining to use the *Laffey* matrix.

Third, the state officials argue that the 2008 hourly rates of PLN's attorneys are inconsistent with rates prevailing in the relevant legal community. Noting that a suit by a prisoner challenging the same CDCR policies would have been subject to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(d)(3)—which would have capped at around $170 the hourly rate for calculating attorneys' fees—the state officials argue that the "relevant community in this case is more in line with PLRA civil rights cases than with a firm practicing securities litigation." Accordingly, the state officials urge us to compare the rates billed by PLN's attorneys to the rates billed by other civil rights attorneys involved in prison litigation.[4]

**[9]** The rates billed by PLN's attorneys are extremely high, of course, as compared to prevailing rates under the PLRA. But the state officials, in the settlement agreement, invited this § 1983 suit by a plaintiff who is *not* a prisoner, which means the PLRA's limits do not apply. *Id.* § 1997e(d)(1). And given the record before us, we cannot say that the rates billed by PLN's attorneys are out of step with the rates charged by others in the relevant legal community. "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Here, the forum is the Northern District of California. The rates prevailing in that district for "similar services by lawyers of reasonably comparable skill, experience, and reputation" thus furnish the proper measure of the reasonableness of the rates billed by PLN's attorneys. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). Although the state officials urge us to

---

[4]PLN argues that the state officials are estopped from challenging the relevant legal community referenced by the district court because they did not appeal the district court's ruling on PLN's first motion for attorneys' fees. PLN, however, did not raise the issue of estoppel in the district court. Accordingly, we do not consider the issue here. *See Gieg*, 407 F.3d at 1046 n.10.

look only to the rates charged by other attorneys involved in prison litigation, the proper scope of comparison is not so limited, but rather extends to all attorneys in the relevant community engaged in "equally complex Federal litigation," no matter the subject matter. *Id.* at 893 (internal quotation marks omitted).

In support of its second motion for attorneys' fees and costs, PLN submitted the declaration of one of its own attorneys as well as that of an attorneys' fee expert compiling the hourly rates charged by various San Francisco-area law firms. These supporting documents show that the 2008 hourly rates billed by PLN's attorneys fall within the range of rates charged by other attorneys involved in federal civil litigation in the Northern District of California during the same period. At one firm, for example, a partner with twenty-three years' experience charged $700 per hour, an associate with five years' experience charged $325 per hour, and paralegals charged up to $190 per hour. At another firm, partners billed an hourly rate of up to $875, and associates billed an average hourly rate of $403. At yet another firm—a disability rights advocacy firm—the co-director of litigation, a 1961 law school graduate, charged $745 per hour, while a staff attorney, a 2003 law school graduate, charged $425 per hour. Although the record could be clearer on how the work of these firms compares to the post-settlement work performed here, we cannot say that the district court abused its discretion by awarding fees at the 2008 hourly rates billed by PLN's attorneys, which are not so out of line as to be unreasonable. We therefore affirm the district court's award of $137,502.46 in attorneys' fees and costs to PLN.

IV

Finally, the state officials argue that the district court erred by retaining jurisdiction to enforce the settlement agreement. They maintain that they have completed all of their obligations under the terms of the settlement. They contend that

because there is nothing further they must do, the district court should have terminated its jurisdiction, thereby foreclosing any future requests for attorneys' fees in federal court.

[10] The state officials are correct that the district court's jurisdiction over the agreement must eventually end; PLN may not pursue reimbursement of attorneys' fees in federal court indefinitely. Whether the time has come for the district court to terminate its jurisdiction, however, cannot be discerned from the record before us. The record is silent with respect to many of the state officials' obligations under the agreement and the extent to which they have been fulfilled. At this juncture, therefore, we are unable to conduct any meaningful review of the district court's refusal to terminate jurisdiction over the agreement. Accordingly, we vacate the district court's decision not to terminate jurisdiction, and remand the case with instructions that the parties be permitted to develop a record of what, if any, obligations under the agreement the state officials have not yet completed. Once the record has been developed more fully, the state officials may move, if they wish, for termination of the district court's jurisdiction.

V

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in part and **VACATED** in part, and the case is **REMANDED** for further proceedings consistent with this opinion. The state officials shall bear PLN's costs for this appeal.