Filed 8/1/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TARYN NISHIKI,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DANKO MEREDITH, APC,<br><br>        Defendant and Appellant. | A147733<br><br>(San Mateo County<br>Super. Ct. No. CIV533665) |

When an employee resigns without notice, California law requires the employer to pay all wages within 72 hours. (Lab. Code § 202, subd. (a)[1].) If the employer willfully fails to do so, the employee's wages continue as a penalty from that due date until the wages are paid, for up to 30 days. (§ 203.) This case considers an award of these "waiting time" penalties, as well as an award of attorney fees to the employee for the employer's unsuccessful appeal. (§ 98.2.)

Taryn Nishiki, a former employee of defendant Danko Meredith P.C.,[2] filed a complaint with the California Labor Commissioner (the commissioner) seeking vacation wages, rest period premiums, and waiting time penalties. She prevailed on her claim for waiting time penalties, and was awarded $4,250. Defendant appealed the award to the superior court, which affirmed the commissioner's award, and awarded Nishiki $86,160 in attorney fees. On appeal, defendant contends the waiting time penalties are

---

[1]  All undesignated statutory references are to the Labor Code.

[2]  For ease of reference, we shall refer to Danko Meredith, P.C. as "defendant," and shall refer to the two partners, Michael Danko and Kristine Meredith as "Danko" and "Meredith," respectively.

unwarranted and the attorney fee award was excessive.  We shall reduce the waiting time penalties and otherwise affirm the judgment.

## I.  BACKGROUND

The pertinent facts are largely undisputed.  Nishiki worked for defendant, a law firm, as office manager and paralegal.  She resigned by sending an email to defendant's two partners, Danko and Meredith, at 6:38 p.m. on Friday, November 14, 2014.  In the email, she noted that her unused vacation time "needs to be paid within 72 hours of my notice of resignation."  She sent a copy of the email to Sharman Blood, defendant's bookkeeper, and Blood sent an email about Nishiki's resignation to both partners at 9:08 a.m. on Saturday, November 15.

At the time Nishiki resigned, she was owed $2,880.31 for her unused vacation time.  Defendant mailed her a handwritten check on Tuesday, November 18.  The check, signed by Meredith, had an inconsistency:  the amount in numerals in the dollar amount box was "2,880.31," the correct amount; however, the amount as spelled out was "Two thousand eight hundred and 31/100," or $80 less than the correct amount.

On Wednesday, November 26, at 9:46 a.m., Nishiki sent an email to Meredith telling her she had been unable to deposit the check because of the inconsistency between the numerical and written amounts, and asserting she was therefore entitled to waiting time penalties.  Just after midnight on Thursday, November 27—Thanksgiving Day— Meredith responded in an email, "No check has been refused or returned so we are unable to confirm it was not honored upon presentation to the bank."  Nishiki responded that she had taken the check to the bank, but that the bank could not accept it because of the discrepancy.  On Monday, December 1, Meredith sent an email in response: "Notwithstanding what your bank told you, the check you were sent is negotiable.  If you would like to return the check to the office, we will issue you a new one.  If you wish to keep the check, we'll issue a second check for $80.  We can mail the check or you can pick it up at the office.  Let me know what you want to do."  Nishiki replied that the bank was not able to accept a check with two different amounts on it, and said she was out of

state but had mailed the check to defendant. Defendant mailed a corrected check for $2,880.31 to Nishiki on Friday, December 5, 2014.

Nishiki filed a complaint with the commissioner. She sought (1) unpaid vacation wages of $366.88; (2) rest period premiums of $23,718.75; and (3) waiting time penalties for the delay in receiving the $2,880.31 check, in the amount of $7,500, calculated as 30 days at the rate of $250 per day.

The hearing officer rejected Nishiki's first two claims for relief. He found Nishiki had been paid for all of her accrued vacation time and that she had not been denied rest periods. As to her waiting time claim—that is, for the time between her resignation and when she received the corrected check—the hearing officer found she was entitled to the penalties for the time between November 18, 2014 and December 5, 2014, and thus awarded her $4,250, or her $250 average daily wage times 17 days.

Defendant appealed the award to the superior court. (§ 98.2.) After a trial de novo, the court found Nishiki was entitled to 17 days of waiting time penalties, or $4,250. Nishiki moved for statutory attorney fees (§ 98.2, subd. (c)), and the court awarded her $86,160 in fees. Defendant appealed from the judgment.

## II. DISCUSSION

### A. Waiting Time Penalties

Defendant contends Nishiki is not entitled to waiting time penalties. Section 202, subdivision (a) provides in pertinent part: "If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting." Section 203, subdivision (a) establishes the waiting time penalties: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Section[] . . . 202 . . . , any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

3

Defendant's first contention is that the 72-hour period for paying wages did not begin to run at 6:38 p.m.—that is, after the close of business—on Friday, November 14, 2014, but rather at the beginning of business hours on Monday, November 17. The parties have not cited any authority considering whether the 72 hours begins to run immediately if the manner in which the employee resigns does not ensure that the employer would actually *receive* the notice until business opens on a later day, and our own research has disclosed none. In considering this issue, however, we are guided by the rule that in interpreting a statute, "[w]e presume that . . . legislative provisions were not intended to produce unreasonable results and adopt a common sense construction over one leading to mischief or absurdity." (*In re Samano* (1995) 31 Cal.App.4th 984, 989.)

The construction of section 202 Nishiki urges, under which the time begins to run as soon as she submits her resignation, regardless of whether her employer actually receives the notice of resignation, falls afoul of this rule. There is no evidence her employers were working or reading their business email after business hours on Friday, November 14, and thus no basis to conclude they actually received her resignation on that date. If Nishiki's position is correct, her accrued wages were due on Monday, May 18—the first business day after her after-hours email. The result would be that, rather than having 72 hours to calculate and pay Nishiki's wages, defendant might have only the length of a single work day.[3] This result contravenes the statute's clear intent to provide an employer a reasonable time to pay an employee who quits without notice.[4]

---

[3] Indeed, as defendant points out, under Nishiki's construction, if an employee resigned after hours on a Friday before a three-day holiday weekend, the employer would be unable to comply with the 72-hour deadline.

[4] That intent is implicit in section 202, and is made explicit in another section, which provides that an employer who lays off employees engaged in oil drilling shall be deemed to have made immediate payment of earned and unpaid wages "if the wages of such employees are paid *within such reasonable time as may be necessary for computation or payment* thereof; provided, however, that such reasonable time shall not exceed 24 hours after discharge *excluding Saturdays, Sundays, and holidays . . . .*" (§ 201.7, italics added.

We conclude, therefore, that the 72 hours did not begin to run when Nishiki sent her email.  We need not decide whether it commenced on Saturday, November 15, by which time defendant's bookkeeper had read her resignation email, or at the start of business on Monday, November 17.  Based on either of these dates, the November 18, 2014 check was timely.

As we have discussed, however, the amount stated in numerals on the check was correct, but the amount as written out in words was eighty dollars less than the amount owed to Nishiki.  Defendant contends the evidence shows that the discrepancy in the check was not willful for purposes of section 203, and therefore argues waiting time penalties are unwarranted.

"The purpose of section 203 is to compel the prompt payment of earned wages; the section is to be given a reasonable but strict construction.  [Citation.]  . . . '[The] statute should have reasonable construction.  Its design is to protect the employee and to promote the welfare of the community . . . . But it is to be observed that the most formidable objection to the statute derives its principal force from the supposed hardships of a hypothetical case wherein the employer is without fault or the employee is guilty of culpable conduct.  The statute . . . contemplates that the penalty shall be enforced against an employer who is at fault.  It must be shown that he owes the debt and refuses to pay it.  He is not denied any legal defense to the validity of the claim.'  [¶] However, to be at fault within the meaning of the statute, the employer's refusal to pay need not be based on a deliberate evil purpose to defraud [employees] of wages which the employer knows to be due.  As used in section 203, 'willful' merely means that the employer intentionally failed or refused to perform an act *which was required to be done*."  (*Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 7.)  Similarly, in *Davis v. Morris* (1940) 37 Cal.App.2d 269, 274 (*Davis*), the court explained, " 'In civil cases the word "willful" as ordinarily used in courts of law, does not necessarily imply anything blameable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done, was done or omitted intentionally.  It amounts

5

to nothing more than this: "That the person knows what he is doing, intends to do what he is doing, and is a free agent." ' "

Applying this principle, the Court of Appeal in *Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 55 (*Gonzalez*), concluded an employer's actions were properly found willful where it did not follow its policy of supplementing its employee's pay when compensation for piece-rate work fell below the minimum wage floor. In *Davis*, the appellate court concluded there was evidence to support the trial court's determination that the defendants did not act in good faith in claiming that wages were not due, and hence that the defendants willfully failed to pay the wages. (*Davis, supra,* 37 Cal.App.2d at p. 274.)[5] We review a finding of willfulness under section 203 for substantial evidence. (*Gonzalez, supra*, 215 Cal.App.4th at p. 54.)

Nothing in the record supports a conclusion that defendant knew or intended to do what it was doing when someone wrote two different amounts on the check.[6] The attachment to the check shows the gross amount of vacation pay due to Nishiki was $4,500, and it reflected deductions for state and federal taxes totaling $1,619.69. The remaining amount was $2,880.31, and this was the amount entered in numerals on the check. There is no basis to conclude the omission of the word "eighty" in the spelled-out amount was anything other than an inadvertent clerical error. In the circumstances, we

---

[5] A good faith dispute about whether any wages are due precludes imposition of waiting time penalties. (Cal. Code Regs., tit. 8, § 13520; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201 (*Amaral*).) No such dispute was involved here.

[6] At the court trial of this matter, the parties presented testimony on the issue of whether Nishiki was deprived of rest breaks. At the end of the day, the court asked the parties when they could return to try "the second issue," i.e., the issue of waiting time penalties. Because Nishiki had family obligations elsewhere, the court suggested the parties stipulate to the pertinent facts. Defense counsel indicated he would like to present testimony on "the intent in sending the check," and the court replied, "It's not like it's a general intent crime. And that is you don't have to intend to cause injury. You just failed to do something that you should have. Intent is not there." The court then gave the parties the opportunity to submit additional briefing on the issue. Its written ruling stated simply, "The Court finds for Plaintiff on the issue of Waiting Time Penalty. Plaintiff is entitled to 17 days waiting time penalties."

conclude the initial error may not properly be treated as "willful" for purposes of an award of waiting time penalties under section 203. (See *Heritage Residential Care, Inc. v. Division of Labor Standards Enforcement* (2011) 192 Cal.App.4th 75, 84 ("Like inadvertence, clerical error denotes behavior that is accidental, not deliberate"]; *Cleveland v. Groceryworks.com, LLC* (N.D. Cal. 2016) 200 F. Supp. 3d 924, 959–960 [Where an employer's failure to pay wages to an employee when those wages are due is a result of a "mistake," it is not willful].)[7]

We must next consider the effect of the delay in sending Nishiki a corrected check. Nishiki told Meredith by email on the morning of Wednesday, November 26, 2014, that she had been unable to deposit the check because of the discrepancy. Meredith sent an email on Monday, December 1, telling Nishiki the check was negotiable, and offering either to issue a second check for $80 or to send a new check for the correct amount if Nishiki returned the original check.

California law provides that, "If an instrument contains contradictory terms, typewritten terms prevail over printed terms, handwritten terms prevail over both, and *words prevail over numbers*." (Cal. U. Com. Code, § 3114, italics added.) The check, therefore, was worth eighty dollars less than the amount defendant calculated Nishiki was owed. Rather that correcting the clerical error immediately when notified of it, either by stopping payment on the original check and issuing a new check for the full amount or by sending an additional check for $80, defendant waited until Friday, December 5— apparently after receiving the original check—to issue a new check, back-dated to

---

[7] We find some support for this conclusion in another provision of the Labor Code. Section 203.1 provides that an employer who pays wages (including wages due under section 202) by a check that is refused payment because drawn on a nonexistent bank account or an account with insufficient funds may be liable for a penalty of up to 30 days' wages and fringe benefits, so long as the check was presented within 30 days after receipt. (§ 203.1.) However, "this penalty shall not apply if the employer can establish to the satisfaction of the Labor Commissioner or an appropriate court of law that the violation of this section was unintentional." (*Ibid.*) By enacting this statute, the Legislature intended employers "to be spared the payment of penalty wages in instances of innocent and excusable error." (*People v. Hampton* (1965) 236 Cal.App.2d 795, 803.)

November 18.  In doing so, defendant violated its statutory obligation to pay wages promptly.  We conclude Nishiki was entitled to waiting time penalties for the period between November 26, when defendant had notice of the error, and December 5, when it sent the corrected check, for a total of nine days.[8]

Defendant contends that, if waiting time penalties are proper, the proper measure is $80 per day, that is, the amount of the underpayment, rather than the amount of Nishiki's daily wage.  We disagree.  Section 203 provides that if an employer willfully fails to pay the wages of an employee who is discharged or who quits, "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid."  This provision has been interpreted to mean the penalty is an amount "equal to the employee's daily wages for each day . . . that the wages are unpaid."  (*Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 377; accord *Mamika v. Barca* (1998) 68 Cal.App.4th 487, 493 ["A proper reading of section 203 mandates a penalty equivalent to the employee's daily wages for each day he or she remained unpaid up to a total of 30 days"].)  There appears to be no dispute that Nishiki's daily wage was $250.  The proper waiting time penalty for nine days was therefore $2,250.

## B. Attorney Fees

Defendant also challenges the trial court's award of attorney fees.  Nishiki requested fees for 121.2 hours, at a rate of $500 per hour, multiplied by 1.5, for a total

---

[8]  Defendant suggests Nishiki "intentionally and manipulatively caused" the delay because she notified defendants of the problem with the check the day before Thanksgiving, "thus effectively preventing the problem from being corrected until five days later on December 1," and that she should be equitably estopped from profiting from this "wrongdoing."  (See *Battuello v. Battuello* (1998) 64 Cal.App.4th 842, 847–848 ["no man will be permitted to profit from his own wrongdoing in a court of justice"].)  There is nothing but speculation to suggest Nishiki was acting in bad faith when she informed defendants of the discrepancy the day before Thanksgiving, and there is no basis to apply the doctrine of equitable estoppel.

requested award of $90,900. This request included all hours her counsel had spent on the court case. The court granted the motion and awarded fees of $86,160.[9]

Section 98.2, subdivision (c) provides: "If the party seeking review by filing an appeal to the superior court is unsuccessful in the appeal, the court shall determine the costs and reasonable attorney's fees incurred by the other parties to the appeal, and assess that amount as a cost upon the party filing the appeal. *An employee is successful if the court awards an amount greater than zero*." (§ 98.2, subd. (c), italics added.) This statute "is not a prevailing party fee provision, instead it is a one-way fee-shifting scheme that penalizes an unsuccessful party who appeals the commissioner's decision." (*Arias v. Kardoulias* (2012) 207 Cal.App.4th 1429, 1435 (*Arias*).) Its purpose is to "act[] as a disincentive to appeal the commissioner's decision" (*id*. at p. 1438) and to " 'discourag[e] unmeritorious appeals of wage claims, thereby reducing the costs and delays of prolonged disputes, by *imposing the full costs of litigation on the unsuccessful appellant*.' " (*Lolley v. Campbell* (2002) 28 Cal.4th 367, 376, italics added.)

"[I]f an employee fails to pay wages in the amount, time, or manner required by contract or statute, the employee may seek administrative relief by filing a wage claim with the commissioner or, in the alternative, may seek judicial relief by filing an ordinary civil action for breach of contract and/or for the wages prescribed by statute. [¶] Labor Code section 98 includes remedial procedures for adjudicating wage claims, enforced by the Division of Labor Standards Enforcement under the direction of the commissioner. It states that the commissioner 'shall have the authority to investigate employee complaints.' (Lab. Code, § 98, subd. (a).) The commissioner 'may provide for a hearing in any action to recover wages, penalties, and other demands for compensation.' (*Ibid*.)" (*Post v. Palo/Haklar & Associates* (2000) 23 Cal.4th 942, 946.) The commissioner may hold a hearing (known as a "Berman hearing"), which is " 'designed to provide a speedy,

---

[9]   At the hearing on the attorney fee motion, the court stated it would award fees of "[$]60,600 times 1.5." The written order reflects an award of $57,440 , with a multiplier of 1.5, for a total of $86,160. Despite the minor deduction, there seems to be no dispute that the court awarded fees for all hours counsel spent.

informal, and affordable method of resolving wage claims,' " and to " 'avoid recourse to costly and time-consuming judicial proceedings in all but the most complex of wage claims.' " (*Id*. at pp. 946–947.) After the commissioner issues a ruling, the parties may seek review by filing an appeal to the superior court, which hears the appeal de novo, granting no weight to the commissioner's decision. (*Id*. at pp. 947–948; § 98.2, subd. (a).)

The issue in *Arias, supra,* 207 Cal.App.4th 1429, was whether a party who obtained a dismissal of an appeal from the commissioner's decision on jurisdictional grounds was entitled to attorney fees. The court noted that in other statutory contexts, such as contractual attorney fees (Civ. Code, § 1717), a prevailing party had been awarded attorney fees after obtaining a dismissal on procedural grounds. (*Arias*, *supra*, 207 Cal.App.4th at pp. 1437–1438.) The court continued, "But adopting the interpretation of conventional, prevailing party cases would ignore the statutory context and misapprehend the legislative purpose in enacting the attorney fees provision in section 98.2, subdivision (c)"—that is, the purpose of providing a disincentive to appeal the commissioner's decision. (*Id*. at p. 1438.) Noting that the dismissal of the appeal was not the equivalent of a determination that the employee was entitled to "zero," the court concluded, "In light of the statutory language, the legislative purpose of the one-way fee-shifting provision, and the amendment to favor employees, we hold that section 98.2, subdivision (c) does not become operative against an employee unless the employee has a new trial in the superior court on the wage claim," and that the trial court had erred in assessing fees and costs against the employee. (*Id*. at pp. 1438–1439.)[10]

---

[10]   The amendment referred to was the addition of the following sentence to section 98.2, subdivision (c):  "An employee is successful if the court awards an amount greater than zero." (Stats. 2003, ch. 93, §2 (c), p. 791; see *Sonic-Calabasas A., Inc. v. Moreno* (2011) 51 Cal.4th 659, 673, fn. 2, cert. granted, judg. vacated and cause remanded (2011) 565 U.S. 973; *Sonic-Calabasas A., Inc. v Moreno* (2013) 57 Cal.4th 1109, 1161.) This amendment superseded our Supreme Court's holding in *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 370, which held that "whether an employer or employee elects a trial de novo after the commissioner issues a decision and award, that party is 'unsuccessful in the appeal,' and thereby liable for the other party's fees and

10

" ' "On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion." ' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213.) " ' "The trial court's decision will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice. If the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence." [Citation.]' [Citation.]" (*Stratton v. Beck* (2017) 9 Cal.App.5th 483, 496.) However, " ' "de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." ' " (*Conservatorship of Whitley*, *supra*, 50 Cal.4th at p. 1213.)

With these principles in mind, we consider first defendant's contention that the trial court erred in awarding Nishiki all of her attorney fees, rather than reducing them to account for the fact that she did not prevail on two of her claims. Defendant relies on the general principle that where a statute allows attorney fees for a prevailing party, a court may reduce attorney fees where a claimant achieves only limited success, and may deny attorney fees for time spent litigating unsuccessful claims. (See *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989–990 (*Chavez*); *Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1311–1312 (*Harman*); *Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 342–344 (*Mann*); *Hensley v. Eckerhart* (1983) 461 U.S. 424, 440 (*Hensley*).)

Defendant's reliance on this principle is unavailing. The authorities on which it relies were "conventional, prevailing party" cases (*Arias*, *supra*, 207 Cal.App.4th at p. 1438), considering statutes that authorized an award of attorney fees to the prevailing

---

costs, unless the resulting trial court judgment is more favorable to the appealing party than was the administrative award from which the appeal was taken." Under the new provision, "an *employee* was still successful in the appeal even if the employee ended up with a reduced award—as long as it was not zero." (*Arneson v. Royal Pacific Funding Corp.* (2015) 239 Cal.App.4th 1275, 1279.)

11

party.  (*Chavez*, *supra*, 47 Cal.4th at pp. 982, 984 [Code Civ. Proc., § 1033, subd. (a),
Gov. Code, § 12965, subd. (b)]; *Harman*, *supra*, 136 Cal.App.4th at pp. 1306–1307 [42
U.S.C. § 1988]; *Mann*, *supra*, 139 Cal.App.4th at p. 344 [Code Civ. Proc., § 425.16,
subd. (c)]; *Hensley*, *supra*, 461 U.S. at p. 440 [42 U.S.C. § 1988].)  They did not
implicate the legislative intent in enacting section 98.2—a one-way provision allowing
attorney fees only against a party who appeals an administrative award, in order to
*discourage* such trial court actions.  Moreover, the statute explicitly provides that "[a]n
employee is successful if the court awards an amount greater than zero."  (§ 98.2, subd.
(c).)  The Legislature thus made clear that a claimant who achieves only minimal success
should be considered successful for purposes of an award of attorney fees.  (See *Lolley v.
Campbell, supra*, 28 Cal.4th at p. 376 ["Our construction of section 98.2, subdivision (c)
serves the legislative purpose of discouraging unmeritorious appeals of wage claims,
thereby reducing the costs and delays of prolonged disputes, by imposing the full costs of
litigation on the unsuccessful appellant"].)

Moreover, it warrants emphasis that it was defendant, not Nishiki, that chose to
appeal and seek a trial de novo after suffering only a relatively modest loss before the
commissioner, having defeated two other claims for which Nishiki sought considerably
higher damages.  If Nishiki consequently was required to incur substantial attorney fees
to retry the entire case, including issues on which she did not prevail before the
commissioner, defendant has only itself to blame.  (See *Arneson v. Royal Pacific Funding
Corp., supra,* 239 Cal.App.4th at p. 1279, fn. 5 [" '[S]ection 98.2 is designed to penalize
appealing employers *and* employees who turn to the courts after rejecting what, in
retrospect, was a reasonable commissioner's award.' "]; *Stratton v. Beck, supra,* 9
Cal.App.5th at p. 497 [affirming $31,265 fee award, rejecting contention it was "grossly
disproportionate to the 'disputed wage claim in this case [of] $303.50' "]; *Eicher v.
Advanced Business Integrators, Inc.* (2007) 151 Cal.App.4th 1363, 1382 ["In many cases,
an employee's attorney's fees in a trial de novo will exceed his or her wage recovery"].)
Under the circumstances before us, the trial court did not act improperly in declining to
reduce the fee award to reflect the issues on which Nishiki was unsuccessful.  To the

12

extent that defendant's specific challenges to the attorney fee award rest on Nishiki's limited success, we reject them.[11]

We also reject defendant's other challenges to the fee award. We bear in mind that, "[w]ith respect to the *amount* of fees awarded, there is no question our review must be highly deferential to the views of the trial court. [Citation.] As our high court has repeatedly stated, ' " '[t]he "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong"—meaning that it abused its discretion.' " ' [Citations.]" (*Children's Hospital & Medical Center v. Bontà* (2002) 97 Cal.App.4th 740, 777.)

Defendant contends the billing statements are "suspect" because some of them must reflect work done in connection with the administrative hearing, for which attorney fees are not available. (*Sampson v. Parking Service 2000 Com., Inc.* (2004) 117 Cal.App.4th 212, 228–230.) This is simply speculation, and it is not borne out by the billing statements submitted in support of the attorney fee motion, which show only time spent after the commissioner's decision had been issued.

We are likewise unpersuaded that the trial court abused its discretion by applying a 1.5 multiplier. After calculating the "lodestar," or total attorney hours expended multiplied by a reasonable hourly rate, the court may "adjust the lodestar amount to take account of unique circumstances in the case. [Citations.] Some factors the court may consider in adjusting the lodestar include: '(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award. [Citation.]' [Citation.] 'The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines,

---

[11] These challenges include the contentions that the fee award is exorbitant because the "sole successful claim was extraordinarily simple," that it is not possible to distinguish in counsel's billing statements time spent on the successful and unsuccessful claims, and that the award bears no reasonable relation to Nishiki's degree of success.

13

retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.' [Citation.]" (*Amaral*, *supra*, 163 Cal.App.4th at p. 1216.) Of these factors, one of the most common fee enhancers is for contingency risk. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 579.) This factor " ' "compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans." [Citation.] "A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of those functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases." ' [Citation.]" (*Id*. at p. 580; see also *Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 900 [upholding 1.5 multiplier that was based primarily on contingent risk]; *Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379, 1399 [upholding "modest" 1.25 multiplier for contingent risk and delay in obtaining payment, as well as unique issues].) Here, Nishiki's counsel represented her on a contingent basis in the appeal, and the trial court noted the high quality of the legal representation on both sides.[12] We see no abuse of discretion in applying a 1.5 multiplier to the award.

Finally, we reject defendant's challenge to the hourly rate of $500. "In determining hourly rates, the court must look to the 'prevailing market rates in the relevant community.' [Citation.] The rates of comparable attorneys in the forum district are usually used. [Citation.] In making its calculation, the court should also consider the experience, skill, and reputation of the attorney requesting fees. [Citation.] The court

---

[12] The declaration of Nishiki's counsel stated, "I agreed to represent Plaintiff Taryn Nishiki on a contingency basis for her appeal of this matter." Defendant argues that, since defendant rather than Nishiki appealed the commissioner's decision, the declaration does not show that counsel represented her in *defendant's* appeal of the decision. We reject this flyspecking argument.

14

may rely on its own knowledge and familiarity with the legal market in setting a reasonable hourly rate.  [Citation.]"  (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009.)  "The courts repeatedly have stated that the trial court is in the best position to value the services rendered by the attorneys in his or her courtroom [citation], and this includes the determination of the hourly rate that will be used in the lodestar calculus."  (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 437; see also *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [" 'The value of legal services performed in a case is a matter in which the trial court has its own expertise.  [Citation.]  The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony' "].)  "The ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will be not disturbed unless the appellate court is convinced that it is clearly wrong." ' [Citation.]"  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)

In support of Nishiki's request for attorney fee, her counsel submitted a declaration stating he had a bachelor's degree from Stanford University and a J.D. degree from the University of Chicago Law School; that he had been practicing law in San Francisco since 1987; and that he had worked as an associate at two law firms, Jackson, Tufts, Cole & Black and Keker & Van Nest.  Nishiki also submitted evidence that Danko had brought a previous lawsuit against a former employer seeking wages owed (the *O'Reilly* litigation), in which he sought and was awarded attorney fees.  The 2012 declaration of Danko's attorney in the *O'Reilly* litigation, James M. Wagstaffe, indicated that his then-current hourly rate of $650 was below the market rate in San Francisco; that another partner at his firm, a 1995 law school graduate, had a current hourly rate of $525, which was below the local market rate; and that an attorney who had been practicing law since 2008 had a regular hourly rate of $300, which was below the market rate; and that the hourly rate of another associate was $400.  In her memorandum of points and authorities in support of the motion for attorney fees, Nishiki also pointed to attorney fee awards found in various legal decisions.  (See, e.g., *Prison Legal News v.*

15

*Schwarzenegger* (9th Cir. 2010) 608 F.3d 446, 455 [hourly rates between $325 for associates and $875 per hour for attorneys involved in federal civil litigation in Northern District of California].)  Defendant contends this evidence is insufficient to support the $500 hourly rate awarded by the trial court.

We are not persuaded that the trial court's award was " ' "clearly wrong." ' " (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1132.)  Defendant contends the hourly rates charged by Danko's counsel in the *O'Reilly* litigation do not support the award because there is no showing that litigation and the present case involve similar types of legal work.  However, they both involved claims for wages under the Labor Code.  In any case, Nishiki's counsel had nearly two decades of experience.  The judge who made the award presided over the trial and commented that it involved "[t]wo good lawyers going at it hammer and tong."  As we have noted, a trial court has its own expertise in the value of legal services performed in a case (*PLCM Group, Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1096; *569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.*, *supra*, 6 Cal.App.5th at p. 437) and it may rely on its own familiarity with the local legal market in setting the hourly rate (*Heritage Pacific Financial, LLC v. Monroy*, *supra*, 215 Cal.App.4th at p. 1009.)  Defendant has not shown the trial court abused its discretion in setting the hourly rate.  (See *Stratton v. Beck, supra,* 9 Cal.App.5th at p. 496 [no abuse of discretion in setting hourly rate of $450, which was supported by substantial evidence].)

Nishiki argues she is also entitled to the attorney fees she incurred in this appeal. We agree.  (*Eicher v. Advanced Business Integrators, Inc.*, *supra*, 151 Cal.App.4th at p. 1384, citing *Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927 [attorney fees authorized by statute include fees on appeal].)

## III.    DISPOSITION

The judgment is reversed with directions.  On remand, the trial court shall enter a new judgment reducing the waiting time penalty from $4,250 to $2,250.  In all other respects, the judgment is affirmed.  On remand, the trial court shall award attorney fees for the appeal in an amount to be determined by the trial court.  Nishiki shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)

16

_____
                              Schulman, J.

*

We concur:

_____
Streeter, Acting P.J.

_____
Reardon, J.

---

*Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Nishiki v. Danko Meredith P.C.* (A147733)

17

San Mateo County Superior Court, No. CIV-533665, Joseph E. Bergeron, Judge.

Law Offices of David Lyon and David E. Lyon, for Plaintiff and Respondent.

Law Office of Gary L. Simms and Gary L. Simms for Defendant and Appellant.